IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: 17-cv-2027-RBJ

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

       v.

SONYA D. CAMARCO,

    Defendant,

and

CAMARCO INVESTMENTS, INC. (a/k/a C INVESTMENTS), and
CAMARCO LIVING TRUST,

    Relief Defendants.

## REMEDIES ORDER

### I. BACKGROUND

**A. <u>Sonya D. Camarco</u>.**

Sonya D. Camarco, a financial advisor and stock broker, defrauded several investor clients out of more than $2.8 million. The stolen funds came at least in part from the accounts of elderly people or their relatives. On May 14, 2018 Ms. Camarco pled guilty in a state court criminal case to felony counts of filing a false tax return, securities fraud, and theft. She was sentenced to prison for two consecutive terms of 10 years each and was ordered to pay more than $1.7 million in restitution to the victims.

**B. <u>SEC Lawsuit and Asset Freeze</u>.**

On August 23, 2017 the SEC filed the present suit to obtain disgorgement of the stolen funds, or assets derived from those funds, and the return of as much as possible of the money to the investors.[1] Essentially, this is an alternative to the restitution order in the criminal case, because it is unlikely that Ms. Camarco, who will be in prison for much of the next 20 years, will be able to pay the restitution otherwise. Ms. Camarco is the "defendant" in the present case, but disgorgement is also sought from the "relief defendants," meaning the other entities or individuals who have monies or assets derived from the stolen funds. The relief defendants originally named were Camarco Investments, Inc. (a company into which Ms. Camarco deposited investor funds) and the Camarco Living Trust (a trust established by Ms. Camarco and her husband Paul O. Camarco into which a substantial portion of their assets were placed. Complaint, ECF No. 1. The Complaint was later amended to add Mr. Camarco individually as a relief defendant. ECF Nos. 50-1 (redlined version of proposed Amended Complaint) and 54 (order granting plaintiff's motion to amend).[2]

On the day the lawsuit was filed I entered an order freezing the funds and other assets of Ms. Camarco, Camarco Investments, and the Trust to the extent those assets were derived directly or indirectly from Ms. Camarco's fraud. ECF No. 10. I also ordered the defendant and the then-two relief defendants to provide an accounting of investor funds and other assets; prohibited destruction or alteration of documents; and authorized expedited discovery. Later I entered a modified form of the asset freeze order. ECF No. 27.

---

[1] The firm for whom Ms. Camarco was working, LPL Financial, has refunded some of the investors' losses.

[2] In this order I will sometimes refer to Sonya Camarco as "Ms. Camarco;" her husband Paul O. Camarco as "Mr. Camarco;" Camarco Investments, Inc. as "Camarco Investments;" and the Camarco Living Trust as "the Trust."

Camarco Investments apparently has no assets now. The remaining Camarco assets are largely held by the Trust. According to an "accounting" filed on behalf of the Trust on November 17, 2017 its assets included five real properties (the Camarco's home in Monument, Colorado, referred to as the Woodhaven property, and four rental properties); a brokerage account; and two bank accounts. ECF No. 43. The Trust filed a statement of rental income and expenses related to the four rental properties. ECF Nos. 42. Monthly statements of rental income and expenses were filed thereafter.

On February 22, 2018 the Court granted the Trust's unopposed motion to sell one of the rental properties, 501 Greta Valley Road, Guffey, Colorado, for $252,500. ECF No. 76. The Court ordered that the net proceeds of the sale be deposited in a savings account maintained by Paul Camarco at Vectra Bank, to be used only if the funds were needed to pay expenses for the other properties. *Id.*

On May 11, 2018 the Court granted the Trust's unopposed motion to sell another rental property, 106 Vale Avenue, Palmer Lake, Colorado, for $235,000. ECF No. 81. The net proceeds were ordered to be deposited in an account maintained by the Trust at Vectra Bank and would remain subject to the asset freeze order. *Id.*

On July 10, 2018 the Court granted the Trust's unopposed motion to sell another rental property, 16970 Buffalo Valley Path, Monument, Colorado for $391,000. ECF No. 88. The net proceeds were again ordered to be deposited in an account maintained by the Trust at Vectra Bank and would remain subject to the asset freeze order. *Id.*

Accordingly, to the best of the Court's knowledge the real estate assets of the Trust now are the proceeds of the sales of the Greta Valley Road, Vale Avenue and Buffalo Valley Path

properties; an Oregon property referred to as the Old Coast Road property (which apparently is being marketed), and the Woodhaven property. There is no dispute that the four rental properties or their proceeds may be disgorged. There is a dispute about the Woodhaven property. That property, which is the Camarco's home, contains personal property, some of which is apparently quite valuable, as I will discuss next.

On August 10, 2018 Ms. Camarco moved for permission to liquidate certain assets described by her attorney as "arguably subject to" the asset freeze order. These assets included vacant real estate at 329 4th Street, Monument, Colorado, which was held in trust for her benefit in a Simplified Employee Pension ("SEP") IRA account, with an estimated value of $69,000; cash or cash equivalents held in a SEP IRA account with an approximate value of $90,810; and funds in a US Bank Money Savings Account in her name with an approximate balance of $35,227. Her motion also sought permission to sell six pieces of artwork with an estimated value of approximately $99,000 (hereafter referred to as "the Artwork") and a Steinway Baby Grand Piano with an estimated value of approximately $10,000 (hereafter referred to as "the Piano." My understanding is that the Artwork and the Piano were in the Woodhaven residence and are probably assets of the Trust, although there was some confusion during the hearing as to whether they belong to the Trust, or to Camarco Investments, or to Ms. Camarco. *See* ECF No. 132 at 53.

Ms. Camarco proposed that the proceeds of these assets be deposited in a savings account at US Bank and later transferred to the state court registry and applied to her restitution obligation. The given reason for these requests was Ms. Camarco's (or her attorney's) fear that the proceeds of the SEC's disgorgement proceeding in the present lawsuit might be deposited

with the United State Treasury and not returned to investors, such that Ms. Camarco would not have her criminal restitution order reduced. *See id.* at 6-8. The SEC did not oppose liquidation of those assets, but it insisted that the assets remain in an account that is subject to the asset freeze order rather than being applied to a restitution order in the state criminal case. It argued that Ms. Camarco's request in that regard was premature because a restitution order had not yet been entered. The SEC also expressed concern that Ms. Camarco intended to use such a payment to affect her sentence in that case, a concern that, even if considered to be reasonable, is now moot. The SEC also indicated that it would likely ask this Court for an order to distribute the proceeds of disgorgement to investors, and that the Artwork and the Piano belonged to the Trust, not to Ms. Camarco. *See* ECF No. 92.

The Court ultimately granted permission to liquidate the assets but ordered that the proceeds of the sales be deposited in the registry of this court if the parties could not otherwise agree on disposition of the proceeds. The Court noted that it would give full faith and credit to the state court's restitution order. ECF No. 103 at 12-14. No one has informed the Court since that time whether or to what extent those assets were liquidated, nor where any proceeds are now located. I have checked with the Clerk of Court who has informed me that the court has received no funds related to the case.

C. **Summary Judgment.**

This case was originally set for a five-day jury trial beginning January 14, 2019 and was later continued to February 11, 2019. However, on September 14, 2018 the SEC filed a motion for summary judgment. ECF No. 98. In the motion it sought (1) a permanent injunction prohibiting Ms. Camarco from violating the securities laws; (2) a determination that "third-tier"

5

civil penalties against her are appropriate; (3) imposition of joint and several liability for disgorgement of $1,503,856.86 against Ms. Camarco and the Trust, subject to offset of any disgorgement paid by Camarco Investments; (4) imposition of joint and several liability for disgorgement of $903,631.10 against Ms. Camarco and Camarco Investments; and (5) an order that Paul Camarco disgorge $118,475.92. *Id.* at 20.[3] The motion was fully briefed. Ms. Camarco did not contest the relief sought except as to civil penalties. The relief defendants contended that the relief sought against them punishes them for the crimes of Ms. Camarco and was inequitable.

Separately, relief defendants Paul Camarco and the Camarco Living Trust filed their own motion for summary judgment, asserting that the relief sought by the SEC has not been authorized by Congress. ECF No. 100. The SEC responded that it is authorized to seek disgorgement from those possessing gains obtained by securities violations. ECF No. 107.

While the summary judgment motions were pending, the SEC moved to convert the jury trial scheduled for February 11-15, 2019 into a one-day remedies hearing to be conducted by the Court without a jury. ECF No. 117. The SEC informed the Court that Ms. Camarco had confessed liability; that the SEC would not, after all, request a civil penalty; and, therefore, that the sole remaining issue to be decided was equitable relief to be ordered against Ms. Camarco and the relief defendants. *Id.* at 2. The Trust and Mr. Camarco opposed the motion on grounds that the relief sought amounted to a civil penalty, such that they were entitled to a jury trial. ECF No. 118. In reply the SEC stated that it was authorized to seek disgorgement; that disgorgement

---

[3] In its reply in support of its motion the SEC changed the amount of joint and several disgorgement requested from Ms. Camarco and the Trust to $1,709,853, including prejudgment interest, and from Mr. Camarco to $80,632, including prejudgment interest. ECF No. 111 at 5-6. As we will see, those figures changed again by the time of the remedies hearing.

6

is an equitable remedy; and that even if it weren't, a jury could only determine *liability* for a civil penalty. But the relief defendants have confessed that they received ill-gotten gains. Therefore, the only remaining issue is the *amount* of the penalty. *See* ECF No. 120 at 1-2.

The Court granted the SEC's motion for summary judgment as to liability against Ms. Camarco and ordered that the scope of the remedies would be determined in the remedies hearing that the SEC had requested. ECF No. 121 at 3. The Court denied the relief defendants' motion for summary judgment. *Id.* at 3-6.

## II. REMEDIES HEARING

The Court held a hearing to determine appropriate remedies, including the extent to which disgorgement would be ordered and against whom, on February 11, 2019. Both sides presented testimony and documentary evidence. A transcript of the hearing can be found at ECF No. 132.

### A. **Plaintiff's Evidence.**

1. The SEC called Michael Hennigan as an expert witness. Mr. Hennigan is a former Certified Public Accountant with an employment history in financial management as a controller and Chief Financial Officer. He presently is a subcontractor for CACI International which holds government contracts including with the SEC. He conducted an extensive investigation of bank records of Ms. Camarco, Mr. Camarco, Camarco Investments, and the Trust. He also reviewed certain LPL Financial records; certain real estate records, and other documents. His goal was to trace the stolen investor funds to the extent he could for the ultimate purpose of supporting a disgorgement order. *See generally* Exhibit 1 (Mr. Hennigan's summary findings and conclusions) and Exhibits 2-24 (supporting documents).

2. Mr. Hennigan's conclusions, as set forth in Ex. 1 at 1-2 were:

a. The amount misappropriated by Ms. Camarco between August 2012 and August 2017 was $1,789,175.78.[4]

b. Of that amount $152,320 has been returned to investors.

c. He labeled the difference between those two numbers, i.e. total misappropriate funds less the amount already returned, the "disgorgable amount." The disgorgable amount per his analysis is $1,636,855.78.

d. $109,927.95 of the disgorgable amount was, in Mr. Hennigan's opinion, made up of misappropriated funds transferred from Camarco Investments to Paul Camarco during the five-year period. This is the amount that the SEC asks the Court to order Mr. Camarco to disgorge.

e. $1,526,927.83 is the disgorgable amount minus the misappropriated funds attributed to Mr. Camarco. The SEC asks the Court to hold Ms. Camarco liable to disgorge that amount and to require Camarco Investments and the Trust respectively to be jointly and severally liable with her to disgorge portions of that amount.

f. $576,516.06 of the latter amount was retained by Camarco Investments. The SEC asks the Court to order that Camarco Investments (which presently has no money) is jointly and severally liable with Ms. Camarco to the extent of that amount.

3. During the hearing the Court tried to learn what amount of misappropriated funds had been provided to the Trust. Mr. Hennigan testified that the number would be $1,636,855.78 (total disgorgable amount) less $109,927.95 (Mr. Camarco) less $576,516.06 (retained by

---

[4] The five-year period reflects the parties' agreement that a five-year statute of limitations applies. Mr. Hennigan's investigation detailed an additional $1,038,690.42 in funds that were misappropriated by Ms. Camarco between July 22, 2004 and June 4, 2012. *See* Ex. 6.

Camarco Investments), i.e., a total of $950,411.77. Transcript of Remedies Hearing, hereafter "Tr.," at 92. However, Mr. Hennigan then admitted, "I don't know that I can state a number," because "the funds were so commingled in so many different buckets along the way that it's difficult to say . . . ." *Id.* at 92-93. He preferred to call his number a broad indicator rather than an absolute number. *Id.*

### B. Relief Defendants' Evidence.

1. Camarco Investments was not represented, and no evidence was presented on its behalf as such.

2. Relief defendants Paul Camarco and the Trust were represented by the same counsel. They called Mr. Camarco as their witness. Generally, Mr. Camarco attempted to show the Court that he was unaware of his wife's thefts; that he had put his own money into the family's living expenses and assets, including the real properties; and that it would be unfair to punish him for the misdeeds of his wife.

3. Mr. Camarco testified that he and Ms. Camarco met in 2001, and they were married in 2002. At that time Ms. Camarco was working for Morgan Stanley. Mr. Camarco recalls that his wife began working for LPL in approximately 2004. Tr. at 122. Mr. Camarco was self-employed in those early years. He testified that his income back then was "inconsistent," and his credit rating was not the best. He was hired by his present employer in 2007 and has earned a good salary since that time. *Id.* at 121, 136.

4. Even before the Camarcos were married Mr. Camarco purchased a home for them on Hillary Place in Parker, Colorado. By that he meant that he provided the down payment,

approximately $38,000. *Id.* 132, 134. The money came from the sale of the home in which he had been living.

5. The second property the Camarcos acquired was 501 Greta Valley Road, Guffey, Colorado, purchased in 2004. This property was intended to be a weekend retreat where they could ride horses. However, it needed a lot of work, some of which was provided by Mr. Camarco, and after the necessary improvements were made it was turned into a rental property. Mr. and Ms. Camarco both contributed to the down payment, which Mr. Camarco estimates to have been around $28,000. There was no evidence as to what their respective contributions were. This property (and all real properties that followed) was put in Ms. Camarco's name and later placed in the Trust. *See* Tr. at 133-38. As indicated above, this property was sold in February 2018.

6. In December 2004 the Camarco's purchased 18510 Woodhaven Drive, Monument, Colorado which has a three-bedroom house, a barn and space for horses. They sold the Hillary property, which by then had been put in Ms. Camarco's name due to Mr. Camarco's credit situation. The intent was to roll the proceeds into the Woodhaven property. Mr. Camarco testified that Woodhaven was purchased like a no-money-down property, other than an $8,000 earnest money check, and it is unclear to me whether, when or how the Hillary proceeds were used. This has been the Camarco's home since it was purchased, and Mr. Camarco and their son Dominic still live there. It was later transferred to the Trust.

7. Although Mr. Camarco's original contribution to the equity in the Woodhaven property was never clarified, he testified at some length about his contributions over the years. He states that he and his wife agreed to split the monthly payments on this property, meaning

principal, interest, taxes and insurance. He made his payments to Ms. Camarco, and she would make the mortgage payments, etc. In the first few years, before Mr. Camarco obtained his present employment, his payments were sporadic. By 2008, however, he states that he made them regularly until Ms. Camarco was arrested, and he has made the whole payment since then. *Id.* at 138-144.

8. Mr. Camarco spent a great deal of time studying records of his payments on the Woodhaven property. Ex. B includes the records he reviewed and a summary chart that he prepared. He has concluded from his study of these records that he contributed $255,787 as his share between 2008 and 2018. *Id.* at 167. Since he began making the payments directly, due to Ms. Camarco's absence, he states that he has contributed another $50,000. *Id.* He testified that he also contributed at least $21,000 in improvements, bringing the total to $337,618. His inconsistent payments in the early years, i.e., between 2005 and 2007, would -- according to him -- add another $42,000, thus bringing his total financial contribution to the Woodhaven property to approximately $380,000. *Id.* at 168. Presumably Ms. Camarco's contribution to the monthly payments was similar.

9. One thing Mr. Hennigan, the SEC's expert, studied was Ms. Camarco's travel expenses between August 2012 and August 2017. *See* Ex. 17. This exhibit describes, among other things, trips to such places as Orlando, Australia/New Zealand, Hawaii and elsewhere where Ms. Camarco paid the airfare for Mr. Camarco and other family members. Mr. Camarco counters that he paid for expenses at the destination such as food and lodging. No figures were provided, but the Court has no reason to doubt that he did pay some of the travel-related expenses.

10. During the hearing counsel for Mr. Camarco and the Trust suggested that the SEC take the four rental properties and let Mr. Camarco have Woodhaven. *See* ECF No. 132 at 104-06. Later in the hearing, after Mr. Camarco's testimony about his roughly equal contribution to the monthly payments on the Woodhaven property, I asked why the Woodhaven property couldn't be sold with the proceeds divided between the SEC (disgorgement) and Mr. Camarco. Tr. at 169. Counsel for Mr. Camarco and the Trust responded, "I don't think the SEC would agree with that." *Id.*

### III. FINDINGS AND CONCLUSIONS

1. Disgorgement is an equitable remedy. As a matter of equity and fairness to the victims of Sonya Camarco's thefts, the misappropriated funds and monies or assets derived from them should be disgorged and returned to the victims to the maximum extent possible.

2. One problem that complicates this goal is the comingling of misappropriated funds with other funds. Mr. Hennigan's opinions were based on an extensive investigation and analysis of the relevant records, and the Court finds that his opinions as summarized in Ex. 1 were generally reasonable given the difficulties created by the comingling. I specifically find based on his manner and demeanor, the depth of his investigation, his credentials, his responses to, and the overall reasonableness of his conclusions, that his testimony was credible.

3. The Court finds that the amount of funds misappropriated by Ms. Camarco during the five-year period in question, August 2012 to August 2017, was $1,789.175.78.

4. Of those misappropriated funds, $152,320.00 has been returned to investors.

5. Therefore, the total of the misappropriated funds that should be disgorged (the "disgorgable amount") is $1,636,855.78.

6. With respect to Mr. Camarco, no evidence was presented that he knew that his wife was stealing from her clients. He testified that he was shocked when her thefts came to light, and that her apprehension and conviction have been very hard on him and the Camarco children. It is hard to believe that he was completely unaware that anything might be amiss given the amounts that were stolen, the fact that the thefts spanned a period from 2004 through 2017, and all the things that Ms. Camarco was able to provide for the family over the years. But his claim essentially is that he thought Ms. Camarco was doing very well in her job, and there was no direct evidence to the contrary.

7. Nevertheless, Mr. Camarco unquestionably benefitted from the funds misappropriated from Ms. Camarco's clients. Mr. Hennigan found that misappropriated funds transferred to or on behalf of Mr. Camarco totaled $109,927.95 and fell into five categories: (1) checks from Camarco Investments to Mr. Camarco in 2014 and 2016; (2) payment of Mr. Camarco's Jeep loan in 2016; (3) payments by Camarco Investments on Mr. Camarco's American Express card from August 2012 to August 2017; (4) charges by Mr. Camarco on Camarco Investments' American Express account during that period; and (5) charges for Mr. Camarco's flights on Camarco Investments' American Express account during that period. ECF No. 1 at 1. I find these opinions to be well supported and reasonable, and although Mr. Camarco might have made some contributions such as to on the ground expenses during some of the trips, I find that this is probably more than offset by other contributions to the family's living style made possible by her thefts. This finding is buttressed by the following testimony by Mr. Camarco himself during the remedies hearing:

> Q. So, Mr. Camarco, turning back to Exhibit 1, do you dispute – or do you think it's fair – let me ask it this way. Do you think it's fair that the $109,927.95 that

was paid on your behalf by Camarco Investments should be returned to your wife's defrauded investors?

A. It was paid by Camarco Investments. It was not paid – it was not – it was paid on my behalf. From an ethical and fair point of view, I'll answer yes to that. Tr. at 225.

8. The Court concludes that Sonya Camarco is liable for disgorgement of $1,526,927.83 of funds she misappropriated from her clients during the five-year period. This is the total disgorgable amount minus the $109,927.95 disgorgable by Mr. Camarco.

9. Camarco Investments is liable jointly and severally with Ms. Camarco for disgorgement of $576,516.06 of the $1,526,927.83.

10. It is impossible to determine from evidence in the record the precise amount of misappropriated funds or derived from misappropriated funds that was transferred into the Trust. As noted above, Mr. Hennigan initially testified that this number is at least $950,411.77, but he then admitted that he couldn't say that with certainty. Neither the defendant nor the relief defendants have suggested a number.

11. Contrary to the expectation of the relief defendants as expressed during the hearing, the SEC now proposes that the Trust's funds for disgorgement purposes include only 50% of the equity in the Woodhaven residence. ECF No. 133 at 4. The SEC asks the Court to order the Trust to disgorge $865,000, comprised of the money made through the sale of the first three rental properties; the estimated equity in the fourth rental property (Oregon); 50% of the estimated equity in the Woodhaven residence; and money held in other bank accounts. *Id.* The Court finds that $865,000 is a conservative but reasonable estimate of the Trust assets excluding the Artwork and the Piano.

12. The Artwork and Piano are disgorgable assets, whether they are owned by the Trust, or Camarco Investments, or Ms. Camarco.

13. Mr. Camarco contributed an unknown amount to the purchase of the rental properties. The Court finds that he contributed $38,000 to the purchase of the Hillary property, but it is not clear whether the proceeds of the later sale of the Hillary property went into the purchase of the Woodhaven property, or any of the rental properties, or some combination thereof. The Court finds that Mr. Camarco contributed some amount to the purchase of the Greta Valley Road property, but I have no basis in the record to determine what that amount is. I likewise have no basis in the record to determine whether or to what extent he might have contributed to the purchase of the other rental properties. Mr. Camarco should in equity get some credit for his contribution to the acquisition of the properties, to the extent there is evidence in the record to support it.

14. The SEP IRA accounts belong to Ms. Camarco, and they should – as she wishes – go to the investors one way or the other and reduce her restitution obligation.

15. Misappropriated funds should, to the maximum extent reasonably possible, should be used to reimburse the victims of Ms. Camarco's thefts and fraud, whether from disgorgement in this case or the payment of restitution in the criminal case. The victims could include LPL Financial to any extent that funds misappropriated during the relevant five-year period have already been reimbursed by LPL. Because Ms. Camarco is presently in prison and will continue to be imprisoned for an extended period, disgorgement of funds in this case is the most practical and equitable way to accomplish the goal within a reasonable timeframe. However, to the extent victims are reimbursed by disgorged funds, other than the funds

disgorged from Mr. Camarco, such reimbursements should be credited against Ms. Camarco's restitution obligation as well. The victims should not be doubly compensated, nor should the U.S. Treasury be enriched by the disgorged funds.

16. In its written closing argument, ECF No. 133, the SEC proposes that the Court add prejudgment interest on the liability of Ms. Camarco and Mr. Camarco. The SEC provides its calculation of the amounts in exhibits A and B to its argument, ECF Nos. 133-1 and 133-2. However, the SEC has not explained the basis for these requests, in particular why it calculated interest quarterly beginning February 1, 2015, at varying rates as set forth in the exhibits.

## IV. ORDER

The Court orders that a final judgment enter as follows:

1. Sonya D. Camarco is permanently enjoined from violating federal and state securities laws.

2. Paul O. Camarco shall pay to the SEC, as disgorgement, misappropriated funds transferred to him in the amount of $109,927.95.

3. Sonya D. Camarco is liable for disgorgement of misappropriated funds in the amount of $1,526,927.83.

4. Camarco Investments, Inc. is jointly and severally liable with Sonya D. Camarco for $576,516.06 of the $1,526,927.83. Any amounts paid by Camarco Investments will be credited toward the amount owed by Sonya D. Camarco.

5. The Artwork and the Piano shall be sold for their fair market value. Regardless whether the Artwork and the Piano are owned by the Trust, or by Camarco Investments, or by Ms. Camarco, the proceeds of their sale are to be disgorged to the SEC.

6. The Camarco Living Trust is jointly and severally liable with Sonya D. Camarco for $865,000 of that amount plus the proceeds of the sale of the Artwork and the Piano if they are owned by the Trust.

7. To any extent not already in progress, the Oregon property shall be listed for sale with a licensed commercial real estate professional and sold for its fair market value. The proceeds shall remain in the Trust until disgorged along with other Trust assets.

8. The Woodhaven property shall immediately be listed for sale with a licensed commercial real estate professional. The Trust, with the assistance of the real estate professional, shall exercise its best efforts to sell the property to an unrelated third party in an arm's length transaction for fair market value within 120 days. The deadline may be extended for a reasonable additional period but only if in the opinion of the real estate professional it is necessary to obtain fair market value for the property.

9. The Trust shall pay to the SEC, as disgorgement, the net (of sales costs and any applicable taxes) proceeds of the sales of the four rental properties, minus the amount that may be retained by Mr. Camarco as explained in paragraph 11 below. In addition, the trust shall pay to the SEC, as disgorgement, 50% of the net proceeds of the sale of the Woodhaven property; plus the net proceeds of the sale of the Artwork and the Piano; plus any other moneys presently held in the Trust's bank accounts. If the sum of the liquidation of these assets, exclusive of the Artwork and the Piano, exceeds $865,000, the excess will be paid to Paul O. Camarco.

10. 50% of the net proceeds of the sale of the Woodhaven property will be allocated Paul O. Camarco, provided however that these funds first be applied to his disgorgement

obligation of $109,927.95 to any extent that obligation has not by then been satisfied, and only the remainder of these proceeds, if any, shall be paid to him.

11. Because there is no other basis in the record to measure Mr. Camarco's contribution to the purchase of the real properties, the Court orders that he will be paid $38,000 from the proceeds of the sale of the rental properties. This is a practical but equitable number, as it does not directly reflect any contributions he may have made to the purchase of properties other than his original contribution to the purchase of the Hillary property, but it also is not discounted by the costs incurred in relation to the sales of any of the rental properties.

12. Mr. Camarco may retain as his property and the furnishings in the Woodhaven residence except the Artwork and Piano and the Google stock inherited from his parents.

13. All disgorged funds will be used to reimburse the victims of Ms. Camarco's theft of investor funds, less any costs necessarily and reasonably incurred in the process of receiving and distributing the funds, but not including any attorney's fees.

14. To any extent that proceeds of the liquidation of Ms. Camarco's SEP IRA accounts might come into the possession of the SEC, those proceeds will be delivered to the appropriate state court personnel for application to her restitution obligation.

15. The appropriate state court personnel in the criminal case shall be notified of all amounts disgorged and returned to investors. This Court believes that all such amounts other than the $109,927.95 disgorged from Mr. Camarco, should be credited against Ms. Camarco's restitution obligation in that court with the approval of the state court. The parties shall exercise their best efforts to see that this occurs.

17. The Court does not now include any award of prejudgment interest. If the SEC wishes for the Court to consider that subject further, and if it can explain the basis and provide legal support for the dates and rates set forth at ECF Nos. 133-1 and 133-2 (or any alternative amounts), the Court would consider whether prejudgment interest in some amount should be included in an amended final judgment.

18. For purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. § 523, any debt for disgorgement or prejudgment interest under the Final Judgment is a debt for the violation of the federal securities laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. § 523(a)(19).

DATED this 8th day of April 2019.

By the Court

_____
R. Brooke Jackson
United States District Judge